UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 6172

———————————————————— x

PENSION TRUST FUND FOR OPERATING :
ENGINEERS, Individually and on Behalf of :
All Others Similarly Situated, :

                  Plaintiff,

   vs.

STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC., BEAR STEARNS
ALT-A TRUST 2006-6, BEAR STEARNS
ARM TRUST 2006-4, BEAR STEARNS
MORTGAGE FUNDING TRUST 2006-AR2,
STRUCTURED ASSET MORTGAGE
INVESTMENTS II TRUST 2006-AR7,
STRUCTURED ASSET MORTGAGE
INVESTMENTS II TRUST 2006-AR6, BEAR
STEARNS ALT-A TRUST 2006-5, BEAR
STEARNS MORTGAGE FUNDING TRUST
2006-AR5, BEAR STEARNS ALT-A TRUST
2006-8, BEAR STEARNS MORTGAGE
FUNDING TRUST 2006-AR4,
STRUCTURED ASSET MORTGAGE
INVESTMENTS II TRUST 2006-AR8, BEAR
STEARNS MORTGAGE FUNDING TRUST
2006-AR3, BEAR STEARNS ALT-A TRUST
2006-7, BEAR STEARNS ALT-A TRUST
2007-1, BEAR STEARNS MORTGAGE
FUNDING TRUST 2007-AR1, BEAR
STEARNS ARM TRUST 2007-3, BEAR
STEARNS MORTGAGE FUNDING TRUST
2006-AR3, BEAR STEARNS ARM TRUST

———————————————————— x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION §§11,
12(a)(2) AND 15 OF THE SECURITIES ACT
OF 1933



<u>DEMAND FOR JURY TRIAL</u>

[Caption continued on following page.]

———————————————————————— x

2007-1, STRUCTURED ASSET MORTGAGE : 
INVESTMENTS II TRUST 2007-AR1,                :
STRUCTURED ASSET MORTGAGE              :
INVESTMENTS II TRUST 2007-AR2, THE   :
BEAR STEARNS COMPANIES INC., BEAR, :
STEARNS & CO. INC., JEFFREY L.              :
VERSCHLEISER, MICHAEL B.                     :
NIERENBERG, JEFFREY MAYER and          :
THOMAS F. MARANO,                                  :
                                                                     :
                                        Defendants.         :

———————————————————————— x

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates ("Certificates") of Structured Asset Mortgage Investments II Inc. ("Structured Asset" or the "Depositor") pursuant and/or traceable to a false and misleading Registration Statement and Prospectus Supplements issued between March 2006 and April 2007 by Structured Asset (collectively, the "Registration Statement"). This action, brought against the issuers and underwriters of the Certificates, involves solely *strict liability* and *negligence* claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      Structured Asset was formed on June 10, 2003. Structured Asset was organized for the purpose of serving as a private secondary mortgage market conduit. Structured Asset is a wholly owned subsidiary of The Bear Stearns Companies Inc. ("BSC"), the parent company of Bear Stearns & Co. Inc. ("Bear Stearns"), which engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, mortgage warehouse lending, and insurance underwriting.

3.      The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶14 established by defendants to issue billions of dollars worth of Certificates in 2006-2007.

4.      On March 6, 2006, Structured Asset and the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with the issuance of billions of dollars of Certificates. On March 10, 2006, Structured Asset filed an amendment to the Registration Statement. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement. The Certificates included several classes or tranches, which had various priorities of payment, exposure to default, interest payment provisions and/or levels of seniority.

5.      The Certificates were supported by large pools of mortgage loans. The Registration Statement represented that the mortgage pools would primarily consist of loan groups generally

secured by first liens on residential properties, including conventional, adjustable rate and negative amortization mortgage loans.

6.    Investors purchased the Certificates based upon two primary factors: return (in the form of interest payments), including timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). The Registration Statement discussed the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans and included numerous representations about the loan-to-value ratios used to qualify borrowers, the appraisals of properties underlying the mortgages and the maximum debt-to-income ratios permitted on the mortgage loans.[1]

7.    The Registration Statement omitted and/or misrepresented the fact that the sellers of the underlying mortgages to Structured Asset were issuing many of the mortgage loans to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required for the lenders to approve and fund the mortgage loans pursuant to the lenders' own guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income required by the lenders' own guidelines to afford the required mortgage payments which resulted in a mismatch between the amount loaned to the borrower and the capacity of the borrower. The Registration Statement failed to disclose that the lenders or the lenders' agents knew that the

---

[1]    Loan-to-value or "LTV" ratio is the ratio of the money borrowed to the market value of the property.

borrowers either could not provide the required documentation or refused to provide it. In addition,

the Registration Statement did not disclose that:

- The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

- The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents or the lenders' agents, such as mortgage brokers, to provide the desired appraisal value regardless of the actual value of the underlying property so the mortgage loan would be approved and funded. In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating the Uniform Standards of Professional Appraisal Practice ("USPAP").[2]

8.     As a result of the misstatements and omissions detailed herein, the Certificates sold to

plaintiff and the Class were secured by assets that had a much greater risk profile in the form of a

statistically significant difference between the expected versus actual performance of such assets

than represented in the Registration Statement, and defendants offered superior credit ratings on the

Certificates as a result of defendants' failure to disclose the underwriting defects and appraisal

manipulations.[3]

9.     By late 2008, the amount of uncollectible mortgage loans securing the Certificates

began to be revealed to the public. To avoid scrutiny for their own involvement in the sale of the

---

[2]     USPAP are the generally accepted standards for professional appraisal practice in North America. USPAP contain standards for all types of appraisal services. Standards are included for real estate, personal property, business and mass appraisal.

[3]     The rating agencies are Moody's Investors Service, Fitch Ratings and Standard & Poor's (the "Rating Agencies"). The Rating Agencies are approved as "Nationally Recognized Statistical Rating Organizations" (or "NRSROs") by the SEC and are intended to provide independent, easy-to-use measurements of relative credit risk.

Certificates, the Rating Agencies began to put negative watch labels on many Certificate classes, ultimately downgrading many. The delinquency and foreclosure rates of the mortgage loans securing the Certificates has grown both faster and in greater quantity than what would be expected for mortgage loans of the types described in the Prospectus Supplements. As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiff and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

**JURISDICTION AND VENUE**

10.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

11.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Structured Asset and Bear Stearns conduct business in this District.

**PARTIES**

12.     Plaintiff Pension Trust Fund for Operating Engineers acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.

13.     Defendant Structured Asset is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed in 2003.

14.     Each of the Defendant Issuers of the Certificates are Delaware trusts which issued billions of dollars worth of Certificates pursuant the Registration Statement. The Defendant Issuers are:

- 4 -

| | |
|---|---|
| Bear Stearns ARM Trust 2006-4 | Bear Stearns ALT-A Trust 2006-6 |
| Structured Asset Mortgage Investments II Trust 2006-AR7 | Bear Stearns Mortgage Funding Trust 2006-AR2 |
| Bear Stearns ALT-A Trust 2006-5 | Structured Asset Mortgage Investments II Trust 2006-AR6 |
| Bear Stearns ALT-A Trust 2006-8 | Bear Stearns Mortgage Funding Trust 2006-AR5 |
| Structured Asset Mortgage Investments II Trust 2006-AR8 | Bear Stearns Mortgage Funding Trust 2006-AR4 |
| Bear Stearns ALT-A Trust 2006-7 | Bear Stearns Mortgage Funding Trust 2006-AR3 |
| Bear Stearns Mortgage Funding Trust 2007-AR1 | Bear Stearns ALT-A Trust 2007-1 |
| Bear Stearns Mortgage Funding 2007-AR3 | Bear Stearns ARM Trust 2007-3 |
| Structured Asset Mortgage Investments II Trust 2007-AR1 | Bear Stearns ARM Trust 2007-1 |
| Structured Asset Mortgage Investments II Trust 2007-AR2 | |

15.    Defendant Bear Stearns was a leading global investment banking firm serving corporations, governments, and institutional and individual investors worldwide, and was a subsidiary of BSC. Its services included debt and equity underwriting, advice on mergers and acquisitions and restructuring, securities dealing and brokerage, and trade execution services, such as market making, equity derivatives and structured investments, for institutional clients. Bear Stearns is an affiliate of the Depositor. Bear Stearns is a Delaware corporation based in New York, New York. Bear Stearns acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. Bear Stearns failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statement were not misleading.

16.    Defendant BSC acted as a holding company and was primarily engaged in business as a securities broker-dealer operating in three principal segments: Capital Markets, Global Clearing Services and Wealth Management.

-5-

17.     Defendant Jeffrey L. Verschleiser ("Verschleiser") was President (Principal Executive Officer) of Structured Asset during the relevant time period. Defendant Verschleiser signed the March 6, 2006 Registration Statement and March 10, 2006 amendment to the Registration Statement.

18.     Defendant Michael B. Nierenberg ("Nierenberg") was Treasurer (Principal Financial Officer) and Principal Accounting Officer of Structured Asset during the relevant time period. Defendant Nierenberg signed the March 6, 2006 Registration Statement and March 10, 2006 amendment to the Registration Statement.

19.     Defendant Jeffrey Mayer ("Mayer") was a director of Structured Asset during the relevant time period. Defendant Mayer signed the March 6, 2006 Registration Statement and March 10, 2006 amendment to the Registration Statement.

20.     Defendant Thomas F. Marano ("Marano") was a director of Structured Asset during the relevant time period. Defendant Marano signed the March 6, 2006 Registration Statement and March 10, 2006 amendment to the Registration Statement.

21.     The defendants identified in ¶¶17-20 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts as they were directors to Structured Asset and signed the Registration Statement for the registration of the securities issued by the Trusts.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired Certificates of the Trusts identified herein pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-132232) (the "Class"). Excluded from the Class are defendants, the officers and directors and affiliates of the defendants, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Structured Asset and/or Bear Stearns or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statement issued billions of dollars worth of Certificates.

24.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the 1933 Act;

(b)    whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the Certificates and/or the underlying mortgage loans held by the Trusts; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

28.    Structured Asset is a subsidiary of Bear Stearns and is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, mortgage warehouse lending, and insurance underwriting. Structured Asset was set up to establish the Trusts, acquire mortgage loans and then issue Certificates of various classes or tranches that were sold to investors pursuant to the Registration Statement. The Registration Statement contained data about the characteristics of the mortgage loans. However, the defendants omitted and/or misrepresented material information in the Registration Statement about the origination, underwriting, quality control, approval and funding practices and policies for the mortgage loans, as well as the likelihood borrowers would repay such mortgage loans according to the terms of the mortgage and/or deed of trust. This depended on several factors, including creditworthiness of the borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans.

### THE FALSE AND MISLEADING REGISTRATION
### STATEMENT/PROSPECTUS SUPPLEMENTS

29.   Structured Asset issued a Registration Statement, filed with the SEC on or about

March 6, 2006 and amended on March 10, 2006, which discussed the mortgage loans contained in

the mortgage pools held by the Defendant Issuers.  Defendants represented that the mortgage loans

held by the Defendant Issuers were mortgage loans made to creditworthy borrowers whose income

documentation was subject to established standards just a notch below those established for other

borrowers.

30.   Emphasizing the underwriting standards and income verification requirements

utilized to generate the underlying mortgage loans held by the Defendant Issuers, the Registration

Statement stated:

UNDERWRITING STANDARDS

Mortgage loans to be included in a mortgage pool will be purchased on the
closing date by the depositor either directly or indirectly from Affiliated Sellers or
Unaffiliated Sellers. The depositor will acquire mortgage loans utilizing re-
underwriting criteria which it believes are appropriate, depending to some extent on
the depositor's or its affiliates' prior experience with the Seller and the servicer, as
well as the depositor's prior experience with a particular type of mortgage loan or
with mortgage loans relating to mortgaged properties in a particular geographical
region. A standard approach to re-underwriting is to compare loan file information
and information that is represented to the depositor on a tape with respect to a
percentage of the mortgage loans the depositor deems appropriate in the
circumstances. The depositor will not undertake any independent investigations of
the creditworthiness of particular obligors.

The mortgage loans, as well as mortgage loans underlying mortgage
securities will have been originated in accordance with underwriting standards
described below.

The underwriting standards to be used in originating the mortgage loans are
primarily intended to assess the creditworthiness of the mortgagor, the value of the
mortgaged property and the adequacy of the property as collateral for the mortgage
loan.

*     *     *

*The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.*

High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

31.    These representations were false and misleading.  The true facts which were concealed were that the originators and other lenders that sold mortgage loans to Structured Asset had become so aggressive in approving and funding loans that many of the mortgage loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender.  Similarly, for those self-employed borrowers who were actually required to document income levels, income levels were routinely inflated to extreme levels in order to ensure approval of the mortgage loans.

32.    The Registration Statement also represented that where property appraisals were required, the appraiser was required to inspect the property to verify that it was in good repair and that construction, if new, had been completed.  The Registration Statement further stated that the appraisal was based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home.  The Registration Statement stated that appraisers and appraisals adhered to USPAP regulations and requirements.

33.    These representations were false and misleading.  The true facts were that the appraisals were unreliable due to lack of controls on the part of Bear Stearns and the lenders.  Moreover, the originators had exerted pressure on appraisers to produce pre-determined appraisal

- 10 -

values that were not based upon the actual values of the properties. Appraisers employed by the originators were also secretly pressured to appraise properties at a certain level or they would not be hired again, resulting in appraisals being done on a "drive-by" basis, where appraisers issued appraisals without a reasonable basis.

## FALSE STATEMENTS ABOUT ORIGINATORS' PRACTICES

### Bear Stearns Residential Mortgage Corporation

34.    The Prospectus Supplements included false statements about the loan underwriting practices of Bear Stearns Residential Mortgage Corp. ("BSRM") which was a key originator for the following Trusts:

Bear Stearns Mortgage Funding Trust 2006-AR3

Bear Stearns Mortgage Funding Trust 2006-AR5

Bear Stearns Mortgage Funding Trust 2006-AR2

Bear Stearns Mortgage Funding Trust 2007-AR1

Bear Stearns Mortgage Funding Trust 2007-AR3

35.    For example, the Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR2, dated September 27, 2006, stated:

(a)    All of the ALT-A mortgage loans originated by BSRM are based on loan application packages submitted through the wholesale or correspondent channel. Based on the documentation type each loan application package has an application completed by the prospective borrower that includes information with respect to the applicant's assets, liabilities, income, credit and employment history, as well as certain other personal information. During the underwriting process, BSRM calculates and verifies the loan applicant's sources of income (except documentation types, which do not require such information to be stated or independently verified), reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines. The mortgage loan file also contains a credit report on each applicant from an approved credit reporting company. Credit history is measured on credit depth, number of obligations, delinquency patterns and demonstrated intent to repay debts, which can be used to underwrite any file.

***Omitted Information***:  BSRM exercised little or no control over correspondents and did not turn down wholesale loans even if the loans did not comply with BSRM's standards.  BSRM was most interested in generating volume, and rejecting loans from correspondents ran counter to its goals. Given that many loans were no documentation or stated income loans, the incentive and motive of correspondents to offer BSRM false loan applications was extremely high.

> (b)     Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management.  When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan.  Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrowers' potential for increased earnings based on education, job training, etc.  Loan characteristics such as refinance transactions where borrowers are reducing mortgage payments and lowering debt ratios may become compensating factors as well.

***Omitted Information***:  Exceptions were not granted on a case-by-case basis where "reasonable compensating factors" existed but were widely granted in the hope that property values would continue to increase and the deficiencies would not matter.  The emphasis was on generating loan volume.

### Countrywide Home Loans, Inc.

36.     The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of Countrywide Home Loans, Inc. ("Countrywide"), a key originator in the following Trusts:

| | |
|---|---|
| Bear Stearns ARM Trust 2006-4 | Bear Stearns ALT-A Trust 2006-5 |
| Structured Asset Mortgage Investments II Trust 2006-AR7 | Bear Stearns ALT-A Trust 2006-6 |
| Structured Asset Mortgage Investments II Trust 2006-AR6 | Bear Stearns ALT-A Trust 2006-7 |

- 12 -

Structured Asset Mortgage Investments
II Trust 2006-AR8

Bear Stearns ARM Trust 2007-1

Structured Asset Mortgage Investments
II Trust 2007-AR1

Bear Stearns ARM Trust 2007-3

Bear Stearns ALT-A Trust 2007-1

37.    For example, the Structured Asset Mortgage Investments II Trust 2006-AR7 Prospectus Supplement dated August 31, 2006, addressed underwriting standards utilized by Countrywide, which originated all of the mortgage loans in Series 2006-AR7:

> (a)    The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

**Omitted Information**: The documents failed to describe the wide latitude lending officers gave to borrowers to "explain" adverse information. Lending officers and originators also knew that borrowers frequently complained to credit rating agencies about adverse information that was in fact true, knowing that the rating agencies, if they could not confirm the adverse information within a specified time period, would remove the adverse information from the report.

> (b)    Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

**Omitted Information**: Countrywide had weak or no controls to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal

- 13 -

values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than

suggested by the Prospectus Supplements/Registration Statement. This was particularly true in

2006-2007, when real estate values in many of the locations where the mortgage pools were located

had stopped increasing at the rapid pace of 2004-2005. Thus, the aggressive lending practices

introduced during those years (where borrowers were granted large mortgages in excess of their

ability to pay with the assurance that refinancing would be possible in a short time) were extremely

risky and likely to lead to significant defaults in years when real estate prices did not increase or

even decreased.

(c) The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

Expanded Underwriting Guidelines

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded

- 14 -

Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

*    *    *

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

***Omitted Information***: These non-traditional mortgage loans were increasingly being widely used by Countrywide and its brokers where the loan-to-value ratios were over the stated limit due to "silent second" liens. In fact, for the mortgage loans generated under the Streamlined Documentation Program, to the extent appraisals were obtained at all, such appraisals were inherently unreliable due to the pressures placed on appraisers to achieve desired valuations. The importance of legitimate

- 15 -

appraisals was even more important under the Expanded Underwriting Guidelines because these mortgage loans provided for loan amounts which reached 90%, 95% or even 100% in some cases. Given the inflated appraisals frequently provided, the undisclosed risk of mortgages exceeding home values was extreme. Countrywide's appraisal practices were intended to inflate the property value so that loans would close. Countrywide was recently sued for inflated appraisals in connection with Countrywide's joint venture with KB Homes.

      (d)     Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

*Omitted Information*: Countrywide's debt-to-income ratios were misstated (understated) by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker. The broker would get paid if the loan went through – even with false information – but would not get paid if they raised questions. Countrywide did not adequately prevent these practices as its motivation was also to get the loans closed – even if there were problems. In fact, during 2007, when there was increasing publicity about suspect lending practices, Countrywide did an audit of lending practices by mortgage brokers and found many inconsistencies in loan applications, but did nothing about it.

      (e)     Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

*Omitted Information*: Countrywide was offering stated income loans up to 100% loan-to-value ratio until March 2007. In fact, in March 2007, Countrywide assured borrowers that 100% financing was still available:

"We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans. "We recognize it's been widely reported that some major lenders, like Countrywide, no longer offer 100% financing. In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing. We still offer one of the widest selections of low- and no-downpayment options to qualified customers, including those with less-than-perfect credit."

38.     The Prospectus Supplement issued in connection with Bear Stearns ALT-A Trust 2006-7, dated October 30, 2006, further addressed the underwriting standards of Countrywide (which originated approximately 50.98%, 71.33% and 35.49% of the loan group I, sub-loan group II-2 and sub-loan group II-3 mortgage loans, respectively), noting:

> Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . . The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

***Omitted Information***: Countrywide was issuing or acquiring mortgages with limited documentation and/or excessive loan-to-value ratios even where compensating factors were not demonstrated. Some borrowers with "No Doc" mortgage loans were wage earners who could have provided employment, income and asset verification, but were not required to do so because their actual income and assets would have been insufficient for the mortgage amounts. As Countrywide has reported increasing foreclosures and delinquencies, analysts who follow Countrywide closely have indicated they were not surprised given Countrywide's past practices. As *MarketWatch* reported on February 15, 2008:

- 17 -

Analysts were not surprised to see the increases, pointing to past lending practices popularized by the lending industry during the height of the housing boom as an underlying problem that will continue to play out in 2008.

"It is certainly not a big surprise that we are seeing more [delinquencies], as many of these loans came about because of poor underwriting practices," [said] Gary Gordon, an analyst for Portales Partners who has been following Countrywide for almost two decades.

Gordon said he expected the number to rise throughout this year as many borrowers crack under the pressure of paying off loans for which they should not [sic] originally received.

"The delinquencies for these kinds of loans are then likely to come out early in the lifecycle of the loan, which is happening now," he said.

39.     The  Bear Stearns ALT-A Trust 2006-7 Prospectus Supplement also stated with respect to Countrywide:

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

***Omitted Information***:  Countrywide's appraisals were frequently inflated, reckless, contained predetermined values or were otherwise unreliable, which caused the loan-to-value ratios to be misstated. This caused mortgages to be issued for borrowers with higher than 38% debt-to-income ratios even though the loan-to-value ratio was higher than 80% of what the property would appraise for under a legitimate appraisal.

## EMC Mortgage Corporation

40.     The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of EMC Mortgage Corporation ("EMC"), a key originator in the following Trusts:

| | |
|---|---|
| Bear Stearns ALT-A Trust 2006-7 | Bear Stearns ALT-A Trust 2006-6 |
| Bear Searns Mortgage Fund Trust 2006-AR5 | Bear Stearns Mortgage Funding Trust 2006-AR3 |
| Bear Stearns ALT-A Trust 2006-5 | Bear Stearns Mortgage Funding Trust 2007-AR1 |
| Bear Stearns Mortgage Funding Trust 2007-AR1 | Structured Asset Mortgage Investments II Trust 2007-AR2 |
| Bear Stearns ALT-A Trust 2006-8 | Bear Stearns Mortgage Funding Trust 2007-AR3 |
| Bear Stearns ALT-A Trust 2007-1 | |

41.    For example, the Bear Stearns ALT-A Trust 2006-8 Prospectus Supplement dated December 28, 2006, addressed underwriting standards utilized by EMC, which originated all of the mortgage loans in Series 2006-8, stated:

> (a)    Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

***Omitted Information***:  EMC was so aggressive in generating loan volume that exceptions were granted as a matter of course and not only when "compensating factors" were present. The emphasis was on generating fees, and EMC has been accused of concealing the true amount of yield spread premiums (the fees) in generating loans.  This was much more important to loan officers than evaluating buyers' repayment ability.

> (b)    All other EMC mortgage loans included in the mortgage pool with a loan-to-value ratio at origination exceeding 80%, have primary mortgage insurance policies insuring a portion of the balance of the EMC Loan at least equal to the product of the original principal balance of the mortgage loan and a fraction, the numerator of which is the excess of the original principal balance of such mortgage loan over 75% of the lesser of the appraised value and the selling price of the related mortgaged property and the denominator of which is the original principal balance of the related mortgage loan, plus accrued interest thereon and related foreclosure

expenses is generally required. No such primary mortgage insurance policy will be required with respect to any such EMC Loan after the date on which the related loan-to-value ratio decreases to 80% or less or, based upon new appraisal, the principal balance of such mortgage loan represents 80% or less of the new appraised value. All of the insurers that have issued primary mortgage insurance policies with respect to the EMC mortgage loans meet Fannie Mae's or Freddie Mac's standard or are acceptable to the Rating Agencies.

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

*Omitted Information*: The representations about EMC's loan-to-value ratios were false and misleading due to undisclosed appraisal manipulations wherein appraisers were implicitly or explicitly pressured to appraise to certain levels. This caused the "value" portion of the loan-to-value ratio to be overstated and the ratio to be understated.

**Wells Fargo Bank, N.A.**

42.    The Registration Statement and Prospectus Supplements contained false statements about the loans originated by Wells Fargo Bank, N.A. ("Wells Fargo"), which was the key originator for Bear Stearns ARM Trust 2007-1.

43.    The Prospectus Supplement issued in connection with Bear Stearns ARM Trust 2007-1, dated February 27, 2007, made false statements about the underwriting standards of Wells Fargo (which originated all of the group IV mortgage loans, approximately 87.44% of the group II mortgage loans and approximately 35.24% of the mortgage loans in the aggregate – the remainder of the mortgage loans were originated by various originators, none of which originated more than 10% of the related mortgage loans in the aggregate), noting:

Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the

loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process.

Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a "Mortgage Score."

***Omitted Information:*** Wells Fargo lenders were becoming increasingly aggressive in mortgage lending practices in 2006, leading to higher defaults, well beyond Wells Fargo's experience. In fact, in 2006, Wells Fargo was increasing its share of subprime mortgages just as the market was softening. The degree to which Wells Fargo was willing to go to increase volume is shown by the fact that, in June 2006, Wells Fargo was considering offering pay-option ARMs.

## FALSE STATEMENTS ABOUT UNDERWRITING OF THE LOANS GENERALLY

44. The Registration Statement and Prospectus Supplements also misrepresented the general origination practices of the sellers and originators.

45. The August 31, 2006 Prospectus Supplement filed by defendants with the SEC in connection with the sale of Structured Asset Mortgage Investments II Trust 2006-AR7 stated:

The mortgage loans, as well as mortgage loans underlying mortgage securities will have been originated in accordance with underwriting standards described below.

- 21 -

The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.

46.    The statement detailed above was false and misleading as the appraisal manipulations occurring at the origination stage, whereby appraisals were inflated or issued with only minimal effort, caused the loan-to-value ratio to be understated, meaning the Aggregate Pool was riskier than represented.

47.    In the Structured Asset Mortgage Investments II Trust 2007-AR1 Prospectus Supplement, defendants detailed "General Underwriting Guidelines," stating:

> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

***Omitted Information***: The alternative underwriting criteria used to make the underlying mortgage loans was not limited to borrowers with a demonstrated ability/willingness to pay, nor was it combined with more restrictive loan-to-value ratios.  In fact, these "reduced documentation" programs were routinely extended to borrowers with poor credit histories, misstated income and misstated assets, and were used to issue loans which were not "verified," but rather apparent deficiencies were largely disregarded, with an emphasis on getting loans closed.

48.    The Structured Asset Mortgage Investments II Trust 2006-AR8 Prospectus Supplement stated:

> Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower. Additionally, Countrywide Home Loans does permit its adjustable rate mortgage loans, hybrid adjustable rate mortgage loans and negative amortization mortgage loans to be

assumed by a purchaser of the related mortgaged property, so long as the mortgage loan is in its adjustable rate period (except for a 3/1 Mortgage Loan, which may be assumed during the fixed rate period) and the related purchaser meets Countrywide Home Loans' underwriting standards that are then in effect.

*Omitted Information*: Exceptions to underwriting policies were not limited to situations involving consideration of "compensating factors," but rather loans outside the underwriting standards were made as a matter of course without consideration of mitigating factors.

49. Structured Asset issued the Registration Statement and Prospectus Supplements for the following Certificates between March 2006 and April 2007, which Registration Statement/Prospectus Supplements were false and misleading and were used to issue billions of dollars in Certificates:

| REGISTRATION STATEMENT DATE | REGISTRATION NO. | TRUST |
|---|---|---|
| MARCH 6, 2006 MARCH 10, 2006 (AMENDED) | 333-132232 | Bear Stearns ARM Trust 2006-4 |
| | | Bear Stearns ALT-A Trust 2006-6 |
| | | Bear Stearns Mortgage Funding Trust 2006-AR2 |
| | | Structured Asset Mortgage Investments II Trust 2006-AR7 |
| | | Structured Asset Mortgage Investments II Trust 2006-AR6 |
| | | Bear Stearns ALT-A Trust 2006-5 |
| | | Bear Stearns Alt-A Trust 2007-1 |
| | | Bear Stearns Mortgage Funding Trust 2006-AR5 |
| | | Bear Stearns Mortgage Funding Trust 2006-AR4 |

Structured Asset Mortgage Investments II Trust 2006-AR8

Bear Stearns Mortgage Funding Trust 2006-AR3

Bear Stearns ALT-A Trust 2006-7

Bear Stearns ALT-A Trust 2006-8

Bear Stearns Mortgage Funding Trust 2007-AR1

Bear Stearns ARM Trust 2007-3

Bear Stearns Mortgage Funding Trust 2007-AR3

Bear Stearns ARM Trust 2007-1

Structured Asset Mortgage Investments II Trust 2007-AR2

Structured Asset Mortgage Investments II Trust 2007-AR1

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

50.     On January 15, 2008, Moody's announced negative rating actions on BSRM:

The ratings were downgraded, in general, based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels. In its analysis Moody's has also applied its published methodology updates to the non delinquent portion of the transactions.

Complete rating actions are as follows:

Bear Stearns Mortgage Funding Trust 2007-AR1

| Cl. | I-B-7, | Downgraded to Baa1, previously A2, |
| Cl. | I-B-8, | Downgraded to Baa2, previously Baa1, |
| Cl. | I-B-9, | Downgraded to Baa3, previously Baa2, |
| Cl. | II-B-1, | Currently Aa1, on review for possible downgrade, |
| Cl. | II-B-2, | Currently Aa3, on review for possible downgrade, |
| Cl. | II-B-3, | Downgraded to Baa2, previously A3, |
| Cl. | II-B-4, | Downgraded to Ba1, previously Baa1, |
| Cl. | II-B-5, | Downgraded to B3 on review for possible further downgrade, previously Ba2, |

*　　　*　　　*

Bear Stearns Mortgage Funding Trust 2007-AR3

| Cl. | I-B-7, | Downgraded to Baa1, previously A2, |
| Cl. | I-B-8, | Downgraded to Baa2, previously Baa1, |
| Cl. | I-B-9, | Downgraded to Baa3, previously Baa2, |
| Cl. | II-B-2 | Currently Aa3, on review for possible downgrade, |
| Cl. | II-B-3, | Downgraded to A3, previously A2, |
| Cl. | II-B-4, | Downgraded to Baa1, previously A3, |
| Cl. | II-B-5, | Downgraded to Baa3, previously Baa1, |
| Cl. | II-B-6, | Downgraded to B1, previously Ba2, |

51.　　The delinquency and foreclosure rates on the underlying mortgages have skyrocketed. The 60+ day delinquencies (including 60+, 30+ day delinquencies, foreclosures and REOs) have increased to as high as 35% of the pools. Some of the pools have 23% in either foreclosure or REO.

<strong>COUNT I</strong>

<strong>Violations of §11 of the 1933 Act<br>Against All Defendants Except Structured Asset</strong>

52.　　Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

53.　　This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Structured Asset.

54.　　The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

55.　　The Defendant Issuers (the defendants listed in ¶14) are strictly liable to plaintiff and the Class for the misstatements and omissions.

- 25 -

56.     Bear Stearns was the underwriter for all of the issuances.

57.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

58.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

59.     Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement and Prospectus Supplements.

60.     Plaintiff and the Class have sustained damages.  The value of the Certificates has declined substantially subsequent to and due to defendants' violations.

61.     At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to late 2008.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against the Defendant Issuers, Bear Stearns and the Individual Defendants

62.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

- 26 -

63. By means of the defective Prospectus Supplements, defendants promoted and sold the Certificates to plaintiff and other members of the Class.

64. The Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

65. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus Supplements at the time plaintiff acquired the Certificates.

66. By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates. Accordingly, plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the defendants sued herein. Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants, Structured Asset and BSC

67.    Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

68.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, Structured Asset and BSC.

69.    Each of the Individual Defendants was a control person of Structured Asset by virtue of his/her position as a director and/or senior officer of Structured Asset.  BSC controlled the Individual Defendants and its subsidiaries.

70.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offerings to be successfully completed.

71.    Structured Asset was the depositor for the offerings and was responsible for routing payments from the borrowers to investors.

72.    Structured Asset and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 9, 2009                    COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
                                       DAVID C. WALTON
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-3301
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Attorneys for Plaintiff

- 29 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PENSION TRUST FUND FOR OPERATING ENGINEERS ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., et al.*, No. 8:06-cv-01716-SDM-EAJ (M.D. Fla.)
*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc., et al.*, No. 2:06-cv-02674-RCB (D. Ariz.)
*In re Yahoo! Inc. Sec. Litig.*, No. 4:08-cv-02150-CW (N.D. Cal.)
*In re Lehman Brothers Equity/Debt Sec. Litig.*, No. 08-cv-05523-LAK (S.D.N.Y.)

       (b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Pension Trust Fund for Operating Engineers v. Meridian Diversified Fund Management, LLC, et al.*, No. 09-cv-03955 (S.D.N.Y.)
*Construction Industry and Laborers Joint Pension Trust and Plumbers and Pipefitters Union Local 525 Pension Plan v. Austin Capital Management Ltd., et al.*, Civil Action No. 09-3614 (S.D.N.Y.)

       (c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Pappas v. Countrywide Financial Corp., et al.*, No. 2:07-cv-05295-MRP(MANx) (C.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2ND day of July, 2009.

PENSION TRUST FUND FOR
OPERATING ENGINEERS

By: _____
Thomas Hendricks, Executive Director

- 2 -

BEAR STEARNS

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type of<br>Asset | Face<br>Amount | Price |
|---|---|---|---|
| 09/05/2006 - SD | Structured Asset Mortgage Investments II Trust 2006-AR7<br>Mortgage Pass-Through Certificates | 5,400,000 | $99.97 |

*Settlement dates are indicated with "SD" attached to the date.